# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 09-22607-CIV-TORRES

CONSENT CASE

MARLITE, INC.,

      Plaintiff,

v.

ALVIN ECKENROD, and
MODULAR WOOD SYSTEMS,
INC.,

      Defendants.

_____/

## ORDER ON POST-TRIAL MOTIONS

This matter is before the Court on the following post-trial motions filed by Defendants Alvin Eckenrod ("Eckenrod") and Modular Wood Systems, Inc. ("Modular") (collectively, "Defendants") (1) Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b) [D.E. 203] and (2) Motion for New Trial Pursuant to Rule 59, Or Alternatively, Motion for Remittitur [D.E. 204].  We have carefully considered the motions, the parties' filings in support of and in opposition thereto, and the trial transcript.  For the reasons set forth below, we find no basis to enter judgment as a matter of law pursuant to Rule 50(b), to order a new trial pursuant to Rule 59, or to issue a remittitur to reduce the amount of Marlite's recovery because the jury's verdict as to liability and actual damages was consistent with the weight of the evidence in the record.

## I.   BACKGROUND

Plaintiff Marlite, Inc. ("Marlite") sued Defendant Modular for misappropriation of trade secrets; tortious interference with business relations; and tortious interference with contract.   Marlite also sued Defendant Eckenrod for breach of contract.   In response, Modular filed a counterclaim against Marlite for breach of a confidentiality agreement.   Prior to trial, the Honorable Donald L. Graham (who was presiding over the case at the time) granted summary judgment for Marlite on the breach of contract claim against Eckenrod.   [D.E. 145].

The Court held a jury trial from June 21 through July 1, 2010.   The jury returned verdicts for Marlite on two of the three counts against Modular, the misappropriation of trade secrets and tortious interference with contract claims, awarding Marlite $312,192.00 for the former and $43,392.50 for the latter, for a total damages award against Modular of $355,584.50.   The jury also returned a verdict in favor of Marlite on its breach of contract claim against Eckenrod individually, awarding Marlite $43,392.50 in damages on that claim.   The jury rejected Marlite's claim against Modular for breach of contract as well as Modular's counterclaim against Marlite.

Defendants have renewed the motion for judgment as a matter of law made at the close of trial, arguing that the jury's verdict is not supported by the evidence.   More specifically, Defendants assert that Marlite failed to introduce evidence to support its burden of proof on the essential elements of the misappropriation and tortious interference claims.   Defendants also contend that Marlite failed to present evidence

of damages that were tied to any of the allegedly improper acts of Defendants. Defendants therefore seek entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on both liability and damages.

In addition, Defendants move for a new trial pursuant to Fed. R. Civ. P. 59 or, alternatively, a remittitur of the damages. They argue that the clear weight of the evidence demonstrates that Modular cannot be found liable for misappropriation or tortious interference. Defendants also assert that prejudicial references made by Marlite throughout the trial deprived them of a fair trial and further, that there is no legal or evidentiary basis for the jury's damages awards.

## II.   *STANDARD OF REVIEW*

### A.   *Judgment as a Matter of Law*

Rule 50 is the mechanism for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the case:

> (a)(1)  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > (A)  resolve the issue against the party; and
> >
> > (B)  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)." *Chaney v. City of Orlando,* 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting 9A C. Wright and A. Miller, *Federal Prac. & Procedure* § 2537

(2d ed. 1995)); *see also Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1210
(11th Cir. 2006). "The question before the district court . . . remains whether the
evidence is 'legally sufficient to find for the party on that issue,' regardless of whether
the district court's analysis is undertaken before or after submitting the case to the
jury." *Chaney*, 483 F.3d at 1227 (internal citation omitted). Further, "any renewal of
a motion for judgment as a matter of law under Rule 50(b) must be based upon the
same grounds as the original request for judgment as a matter of law made under Rule
50(a) at the close of the evidence and prior to the case being submitted to the jury."
*Chaney,* 483 F.3d at 1227 (quoting *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 903
(11th Cir. 2004)).

Thus, under both Rule 50(a) and 50(b), a moving party has a heavy burden to
meet. The standard of review for a district court to grant the motion is whether, "when
the facts and inferences are viewed in the light most favorable to the opposing party,
[they] 'point so strongly and overwhelmingly in favor of one party that the Court
believes that reasonable men could not arrive at a contrary verdict.'" *United States v.
Vahlco Corp.,* 720 F.2d 885, 889 (11th Cir. 1983) (quoting *Boeing Co. v. Shipman,* 411
F.2d 365, 374 (5th Cir. 1969)). The court must "affirm the jury verdict unless there is
no legal basis upon which the jury could have found for [the plaintiff]." *Telecom Tech.
Servs., Inc. v. Rolm Co.,* 388 F.3d 820, 830 (11th Cir. 2004); *see also Robbins v. Koger
Props., Inc.,* 116 F. 3d 1441, 1446 (11th Cir. 1997) ("A mere scintilla of evidence is not
sufficient to support a jury verdict.").

While a court "must afford due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation." *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1245-46 (M.D. Fla. 2007).  Rule 50 allows the trial court to remove issues from the jury's consideration "when the facts are sufficiently clear that the law requires a particular result." *Id.* at 1246 (citing *Weisgram v. Marley Co.*, 528 U.S. 440, 447 (2000)).

Accordingly, if Marlite did not present a legally sufficient evidentiary basis for a reasonable jury to find in its favor on an essential element of one of its causes of action, we must grant Defendants' Rule 50(b) motion for judgment as a matter of law on that claim.  *See*, e.g., *Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1278 (11th Cir. 2005) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004)).  Conversely, we must deny Defendants' motion for judgment as a matter of law as to a particular claim if Marlite presented "enough evidence to create a substantial conflict in the evidence on an essential element" of that claim.  *Id.* (citing *Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.")).

To that end, we note that it is not the function of the Court to make credibility or factual determinations under the guise of a Rule 50 review.  *See, e.g., Jackson v. State of Ala. State Tenure Comm'n,* 405 F.3d 1276, 1281 (11th Cir. 2005).  If there are conflicting inferences that can be drawn from that evidence, it is not the Court's role

to pick the better one.  Instead, all reasonable inferences from the evidence must be drawn in Marlite's favor.  *Id.* ("a court . . . must draw all reasonable factual inferences in favor of the nonmoving party."); *see also Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000)).

Similarly, if we disagree with the jury's assessment of damages, a federal court has no general authority to reduce the amount of a jury's verdict.  *Kennon v. Gilmer*, 131 U.S. 22, 29 (1889).  The Seventh Amendment prohibits re-examination of a jury's determination of the *facts*, which includes its assessment of the extent of the plaintiff's injuries.  *Id.* at 30 ("[A federal court may not] according to its own estimate of the amount of damages which the plaintiff ought to have recovered, . . . enter an absolute judgment for any other sum than that assessed by the jury.").  To do so would deprive the parties of their Seventh Amendment right to a jury trial.  *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1328 (11th Cir. 1999).[1]

If *legal* error is detected, however, the court has the obligation and the power to correct the error by vacating or reversing the jury's verdict.  *Id.* at 1330.  Where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct

---

[1]     When a court finds that a jury's award of damages is excessive, however, it may grant the defendant a new trial or grant the plaintiff the option of a remittitur of damages.  *See Johansen*, 170 F.3d at 1328-29.

amount. *Id.* (citing *New York, L.E. & W.R. Co. v. Estill*, 147 U.S. 591, 622 (1883) (modifying a judgment when the jury improperly awarded interest)).  If a reduction in damages is necessitated by legal error, the reduction is not a remittitur and a new trial is not required. *Id.* at 1330-31 (court may enter judgment reducing punitive damages award to comply with due process guidelines as a matter of law, without plaintiff's consent).

**B.   *New Trial***

As an alternative to entering a judgment as a matter of law, the Court may grant a new trial after a jury trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "[M]otions for a new trial are committed to the discretion of the trial court." *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999); *accord Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985).  The reasons justifying such relief include "a verdict which is against the weight of the evidence, substantial errors in the admission or rejection of evidence, and improper opening statements or closing arguments."   *Rosa v. City of Fort Myers*, No. 2:05-cv-481-FtM-29SPC, 2008 WL 398975, at *2 (M.D. Fla. Feb.12, 2008) (internal citations omitted).  "Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence.'" *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556

(11th Cir. 1984)).  If conflicting testimony is presented and the jury makes credibility determinations and weighs the evidence, the jury verdict should not be disturbed if there is some support for the jury's decision.  *See, e.g., Quick v. City of Birmingham*, 346 Fed.Appx. 494, at *1 (11th Cir. 2009).

**C.**     **_Remittitur_**

Finally, where the jury has properly determined liability but the award "exceeds the amount established by the evidence," the appropriate remedy is "a remittitur order reducing a jury's award to the outer limit of the proof," *Goldstein*, 758 F.2d at 1448, or alternatively, to conduct "a new trial exclusively as to damages."  *Aronowitz v. Health-Chem Corp.,* 513 F.3d 1229, 1242 (11th Cir. 2008).  Although "a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court," *Goldstein*, 758 F.2d at 1447, "the standard for remittitur is . . . that it 'is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'"  *Moses v. K-Mart Corp.*, 905 F. Supp. 1054, 1057 (S.D. Fla. 1995) (quoting *Goldstein*, 758 F.2d at 1448).  In such cases, "the Court is bound to allow Plaintiffs the maximum possible recovery," keeping in mind that "the Court is not to substitute its judgment for the jury's, and where there is sufficient evidence in the record to support the award, the Court should not reduce merely because it would have found differently."  *Id.*

### III.    ANALYSIS

**A.    <u>Rule 50(b)</u>**

**1.    <u>Misappropriation of Trade Secrets</u>**

**(a)    Trade Secrets**

The jury found that Marlite's customer and pricing information constituted trade secrets, that Modular misappropriated those trade secrets, and that Marlite suffered damages as a result of Modular's actions.  [D.E. 200 (Special Verdict Form) at 2-3].  In moving for judgment as a matter of law, Modular argues that Marlite failed to present sufficient evidence at trial to support the jury's verdict on this claim.

To prevail on this count, Marlite was required to establish that (1) it possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret that Marlite possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.  *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.002).  A trade secret is information that derives its economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy.  *Id.* (citing *American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).  If the information is generally known or readily accessible to third parties, then it does not qualify for trade secret protection.  *Del Monte*, 136 F. Supp. 2d at 1291; *American Red Cross*, 143 F.3d at 1410.

Marlite had the burden at trial to describe the alleged trade secrets and show that it had taken reasonable steps to protect their secrecy. *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007) (citing *American Red Cross*, 143 F. 3d at 1410). We find that Marlite met its burden in both respects.

"Whether a particular type of information constitutes a trade secret is a question of fact." *Cheney v. IPD Analytics, LLC*, No. 08-23188-CIV, 2009 WL 4800247, at *5 (S.D. Fla. Dec. 11, 2009) (plaintiff had presented sufficient evidence to create a triable issue of fact as to whether the defendants' research, compilation or customer information constituted a trade secret); *Del Monte*, 136 F. Supp. 2d at 1292 (whether a plant's genetic material constitutes a trade secret is a question for the trier of fact). There is ample authority holding that the term "trade secret" includes active customer lists. *Cheney*, 2009 WL 4800247, at *5; *Cytodyne Techns., Inc. v. Biogenic Techns., Inc.,* 216 F.R.D. 533, 536 (M.D. Fla. 2003) (active customer lists); *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (active customer list that was a distillation of a prospective customer list that contained names of entities that had actually ordered from plaintiffs; a detailed purchasing history for each entity; was maintained as confidential; and was not readily ascertainable to the public, qualified as a trade secret entitled to injunctive protection); *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3d DCA 1982) (finding customer list to be trade secret where list was "the distillation of a larger list of financial planners, reflecting considerable effort, knowledge, time, and expense on the part of the plaintiff.").

Similarly, pricing information such as expenses, costs, profit margins, and run rates have been held to constitute trade secrets. *See, e.g., Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995) (temporary injunction issued where trade secrets included pricing and profit structure as this type of information "would obviously be important for a competitor in deciding how much it could undercut Alloy's prices."); *Stoneworks, Inc. v. Empire Marble & Granite, Inc.*, No. 98-2017-CIV-HIGHSMITH, 2009 WL 998962, at *4 (S.D. Fla. Nov. 20, 1998) (under FUTSA, "a company's manufacturing techniques, customer lists, supplier lists, pricing information, and accounting data [] all [] qualify for protection as trade secrets."); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (customer-specific information, such as product preferences and deviated pricing, and cost and profit margin information, constituted trade secrets under Illinois' uniform trade secrets statute); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 681 (S.D. Ind. 1998) ("Knowledge of financial information indicating the company's strengths and weaknesses, its production and marketing costs, its sales information and profit margins broken down by product, by customer, by salesperson, and by region could all be helpful to another manufacturer of competing products, especially in markets for highly competitive, relatively fungible products like commercial roofing products . . . [and in Indiana have been] protected as trade secrets.").

We find that Marlite presented sufficient evidence for the jury to determine that its customer and pricing information constituted trade secrets. The jury heard that customer information was more than just the names and office telephone numbers of

slatwall customers. It included personalized details about customers such as the names and cellphone numbers of purchasing managers; the products customers bought and the prices they paid; and their purchasing, shipping, and payment histories. While a search of the internet might reveal the names of many of Marlite's customers, no evidence was adduced that specific customer contacts or pricing, shipping, and payment histories of these customers could be obtained from the internet or any other readily ascertainable means.

With regard to pricing, Marlite witnesses testified that this information included indirect labor and overhead expenses used in calculating profit margins; costs of production of slatwall; run rates; labor costs; raw material prices; and Marlite's margin expectations that varied based on the purchasing history of specific customers. As Marlite's President and CEO John Popa explained at trial, maintaining the confidentiality of this information was critical to Marlite's business:

> Q. Now, why wouldn't you want any competitor of Marlite to know what your profit margins are for specific customers?
> A. Well, it would be absolutely [] devastating to the business because that competitor, then, could price a product right at your margin to force you out of the business. You just wouldn't want that to happen.
> Q. In plain English, what does that mean, when you price it at the margin?
> A. What it means is, if that competitor would know your cost and know your selling price or have access to your system, they could price it to compete with you to literally put you out of business, to price your product at a point where they know you're losing money.

[D.E. 221 at 249].

Modular suggests that because Marlite's customers were free to disclose the company's prices to its competitors, the pricing information could not have constituted

a trade secret.  But Marlite's trade secrets are more than just the price offered to one particular customer at a particular time.  It includes customer and pricing information based on an intimate knowledge of Marlite's costs and a personalized and historical knowledge of a customer's purchasing, shipping, and payment histories. This information was not publicly known.   Setting the price for a particular customer for a particular order was dependent on a number of factors to which customers and competitors simply were not privy.

Modular also contends that, because Marlite's prices fluctuated, any knowledge of customer pricing quickly became obsolete so that this information could not derive economic benefit.  While it is true that the competitive advantage of knowing Marlite's customer information and pricing structures would eventually dissipate over time, we need not concern ourselves with when that hypothetical point might be.  Here, Canas left Marlite, went straight to work for Modular, and immediately began contacting Marlite's customers.  The evidence showed that, shortly thereafter, Marlite had to drop its prices in order to compete with Modular for its customers' business.  Also in evidence was the fact that Canas and other Marlite employees signed one-year non-compete agreements as a condition of their employment with Marlite, suggesting that the advantage of knowing Marlite's sensitive business information lasted far longer than the six to eight weeks that Canas worked for Modular.

While Modular may have presented contradictory evidence on these points, the jury nonetheless had a sufficient evidentiary basis to conclude that Marlite's customer and pricing information was valuable information that the company reasonably wanted to keep confidential and that a competitor would find competitively useful.  The jury

weighed the evidence and made its own determination as to whether this information constituted trade secrets. We will not disturb a jury finding that is supported by legally sufficient evidence.

### (b)    Maintaining the Confidentiality of Trade Secrets

We also find that Marlite presented sufficient evidence for the jury to determine that Marlite took reasonable steps to maintain the confidentiality of its trade secrets. The jury heard that Marlite's customer and pricing information was maintained in SyteLine, a password-protected database. Not every employee had access to the database; access was dependent on the individual employee's job functions. Marlite's employees were subject to a computer use policy that restricted their use of confidential and trade secret information. Employees received annual training on how to handle confidential and trade secret information. Company documents with sensitive information were kept under lock-and-key. Certain employees were subject to non-solicitation agreements that prohibited them from contacting Marlite's existing customers and/or confidentiality agreements that prohibited them from divulging trade secrets after they left Marlite's employ. And every potential employee was required to sign an employment application that contained a confidential information section. These measures were reasonably designed to preserve the secrecy of Marlite's trade secrets.

Modular suggests that, because not all of Marlite's employees were required to sign confidentiality agreements, those who did not were not prohibited from disclosing confidential information. But Marlite need not require that each of its employees

signed such an agreement in order for its confidential information to qualify as a trade secret.   In addition to Marlite's employment application which contained a confidentiality clause, under Florida law, where an employee acquires trade secret information during the course of her employment, the employee is under a duty, even in the absence of an express contractual provision, not to disclose that information in her new employment for her own or another's benefit to the detriment of her previous employer.  *See, e.g.*, *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 10 So.3d 202, 206 (Fla. 4th DCA 2009) (citing *Lee v. Cercoa, Inc.* 433 So. 2d 1, 2 (Fla. 4th DCA 1983)); *Southeastern Mech. Servs., Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008).  All of Marlite's employees were obligated to not disclose the company's trade secrets even absent a specific confidentiality agreement.

We find that the evidence supports a jury finding that Marlite took reasonable and significant steps to maintain the confidentiality of its customer information and pricing.

### (c)    Misappropriation of Trade Secrets

Having established that it possessed trade secrets and took reasonable steps to protect that information, Marlite next needed to prove that Modular acquired that secret information through improper means.[2]  Modular claims that Marlite failed to

---

[2]      The FUTSA prevents a former employee from acquiring or using a trade secret through or for improper means. "Misappropriation" is defined as:

(a)  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

prove that Canas misappropriated any information from Marlite or that Modular acquired, disclosed, or used any of Marlite's trade secrets.

We find that Marlite presented sufficient evidence from which a jury could reasonably determine that Canas possessed, used, and/or disclosed Marlite's trade secrets and that she did so at Modular's direction and for its benefit.

First, it is undisputed that Canas was familiar with Marlite's trade secrets and regularly used that information while employed at Marlite. She had complete access to SyteLine, the company's password-protected database that contained customer and pricing information. Canas knew what Marlite's profit margin was, was authorized to deviate from Marlite's established prices, and knew how low a price she could offer a customer before Marlite would lose money on a particular sale. She also compiled the

---

(b)  Disclosure or use of a trade secret of another without express or implied consent by a person who:

1.  Used improper means to acquire knowledge of the trade secret; or

2.  At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

   a.  Derived from or through a person who had utilized improper means to acquire it;

   b.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

   c.  Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3.  Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

company's sensitive business information in a blue binder that was kept inside the Miami facility until Canas left the company for Modular.[3] She took the binder with her and did not return it to Marlite until after this litigation had commenced.

Next, it is undisputed that Modular hired Canas to get leads, find customers, and sell slatwall in Florida, in direct competition with Marlite. That meant knowing what the customers were paying for slatwall and either matching or lowering the price to get their business. Canas knew Marlite's bottom-line prices, i.e., how low she could price slatwall before Marlite would lose money on a sale.

Further, it is undisputed that in the approximately six to eight weeks that Canas worked for Modular she contacted and solicited business with at least thirty-nine (39) customers of Marlite. Even if these customers were on a list provided to her by Modular's Eddie Bishop, as opposed to Canas generating the list herself, they were customers with whom she had worked while employed at Marlite. And Canas had Marlite's confidential information about those customers at hand, either in her head or in the blue binder.

Finally, it is undisputed that shortly after Canas began contacting Marlite's customers, Marlite began receiving calls and emails from customers seeking lower prices. The volume of slatwall that Marlite sold to certain customers decreased. In

---

[3]     The binder was created while Canas was employed at Precision Wood Products, Inc. ("Precision"), the company that Marlite purchased in 2006 (the purchase included Precision's customer lists). Canas continued to update the information in the binder during her tenure at Marlite. The binder thus contained different pricing structures for different customers, domestic and international, dating back to approximately 2002. Although the information was also maintained in the SyteLine database, keeping it in a binder allowed for quick access when a customer called asking about prices.

response, the company lowered its prices in order to retain some of those customers. Moreover, there was evidence that beginning in June 2009, some of the 39 companies that Canas contacted began to do business with Modular for the first time in a very long time, if ever.

Citing testimony from Modular's witnesses that Canas did *not* divulge confidential information to anyone at Modular, Modular argues that the evidence establishes it did *not* learn about Marlite's prices from Canas, but rather, from its customers or elsewhere. However, we find the jury had sufficient circumstantial evidence from which to infer to the contrary, that Canas provided consumer and pricing information to Modular that allowed Modular to undercut Marlite's prices for certain customers, thereby competing successfully against Marlite in Florida.

As the evidence at trial revealed, Eckenrod and Modular had been selling slatwall in Florida since Marlite purchased Precision in 2006, in competition with and unbeknownst to Marlite. Once Canas was hired and began contacting Marlite customers on Modular's behalf, Marlite experienced a significant drop in the volume of slatwall it sold to its customers. The company had to reduce its prices by fourteen percent (14%) to stay competitive. Perhaps this was the result of Canas' superior salesmanship or other unidentified reasons, and not because she shared confidential information with Modular. But we think there was sufficient evidence for the jury to conclude otherwise.

Because we find that the jury's verdict on the misappropriation of trade secrets claim is supported by sufficient evidence in the record, Modular is not entitled to judgment as a matter of law on this claim.

### 2. *Tortious Interference with Contract Claim Against Modular*

Modular also argues that Marlite failed to present sufficient evidence that Modular tortiously interfered with Canas' confidentiality and non-solicitation agreement with Marlite. To prevail on this claim, Marlite needed to show: 1) the existence of a contract; 2) Modular's knowledge of the contract; 3) Modular's intentional procurement of the contract's breach; 4) the absence of any justification or privilege; and 5) damages resulting from the breach. *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998) (citing *Florida Tel. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)). Actions taken by Modular to safeguard or protect its financial interest, so long as improper means were not employed, would be privileged. *Id.; see also, e.g., Ice Portal, Inc. v. VFM Leonardo, Inc.*, No. 09-60230-CIV, 2010 WL 2351463, at *7 (S.D. Fla. June 11, 2010) ("the competition privilege bars a plaintiff from turning a defendant's broken promise not to compete into a claim for tortious interference."). Moreover, whether Modular acted with malice is of no consequence, if its actions were privileged. *Johnson Enters.*, 162 F.3d at 1322.

We find that Marlite presented sufficient evidence which, if believed by the jury, supported the verdict in its favor on this claim. The jury heard that Canas' agreement precluded her from soliciting Marlite's customers for one year following the termination of her employment with Marlite. Canas knew she was bound by the terms of the

agreement for a one-year period regardless of whether her employment with Marlite was terminated in January or June of 2009.  When Canas' manager at Marlite advised her that the company did not have a signed confidentiality and non-solicitation agreement for her on file and therefore it did not exist, Canas failed to inform him that she had a copy of that agreement in her possession.  Canas never followed up with anyone at Marlite to inquire about the validity of the agreement.

Modular hired Canas in mid-May 2009.  In early June 2009, Marlite told Canas that it had located a copy of her confidentiality and non-solicitation agreement.  On or about June 11, 2009, Modular received a copy of the agreement from Marlite.  Nonetheless, and despite Marlite's explicit request that Canas refrain from contacting Marlite customers, neither Canas nor Modular made any effort to halt Canas' contact with Marlite's customers.  No one at Modular directed Canas to stop contacting Marlite's customers, and Canas continued to do so until Marlite obtained a court injunction prohibiting this activity.  On July 22, 2009, the same day that the court issued the preliminary injunction requiring Canas to comply with the terms of her agreement (which prohibiting her from soliciting Marlite's customers), Eckenrod terminated her employment with Modular.

Based on this evidence, the jury could reasonably conclude that both Canas and Modular knew Canas had an agreement with Marlite that prevented her from contacting Marlite's customers.  Canas violated the terms of that agreement by contacting Marlite's customers for Modular's benefit, and Modular knew and did not

stop her.  Moreover, the moment Canas could no longer solicit Marlite's customers, Modular fired her.

This evidence supports a jury finding that Modular intentionally interfered with Canas' confidentiality and non-compete agreement with Marlite.  Further, we fail to see how these facts support application of a competition privilege to Modular's actions. Eckenrod was insistent that he never intended to injure Marlite.  But intent is typically a question of fact, and the jury made its assessment of Eckenrod's credibility as well as the other evidence in the record.  There is simply no basis to enter judgment in Modular's favor on the tortious interference with contract claim.

### 3.   *Damages*

At trial, Marlite sought both compensatory damages in the form of lost profits as well as punitive damages against Defendants.   The jury awarded Marlite compensatory damages in the following amounts:  $43,392.50 on Marlite's claim for breach against Eckenrod; $312,192.00 for Modular's misappropriation of Marlite's trade secrets; and $43,392.50 for Modular's tortious interference with contract.  No punitive damages were awarded.  Modular alleges these awards are unsupported by the record and should be set aside.

### (a)   *Breach of Contract Damages Against Eckenrod*

Prior to trial, the Court determined that Eckenrod breached his Non-Compete Agreement with Marlite by hiring Canas to work for Modular without waiting the prescribed period of time required by his restrictive covenant.  The Court therefore granted summary judgment in Marlite's favor on the breach of contract claim against

Eckenrod, but left the issue of damages for trial.  The jury was asked what amount of lost profits damages, if any, would fairly compensate Marlite for the breach of Eckenrod's contract.  Modular now argues that the jury's award of $43,392.50 is unsupported by the evidence adduced at trial.

In a contract dispute, the burden is on the injured party to prove that its damages were proximately caused by a breach of the contract.  *See, e.g., Crowley Amer. Transport, Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784 (11th Cir. 1999); *Prestige Dev. Group, Inc. v. Russell*, 612 So. 2d 691, 692 (Fla. 1st DCA 1993).  Marlite was entitled to recover all damages causally related to Eckenrod's breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract. *See, e.g., Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.*, 25 So.3d 593, 596 (Fla. 1st DCA 2010) ("It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract.").  The parties did not have to contemplate the exact injury so long as the actual consequences "could have been reasonably expected to flow from the breach."  *Id.* (citation omitted).

As for the amount of damages, there must be some reasonable basis in the evidence to support the jury's award.  *See, e.g., Taylor v. Lee*, 884 So. 2d 222, 224 (Fla. 2d DCA 2004).  "In lost profit cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages. . . .  Thus, lost profit damages are recoverable if there

is 'some standard by which the amount of damages may be adequately determined.'" *Nebula*, 454 F.3d at 1217; s*ee also, Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007) (once causation of damages is proven with reasonable certainty, uncertainty as to the precise amount of lost profits will not defeat recovery so long as the injured party presents a reasonable "yardstick" by which to estimate its damages (citing *Nebula*)).

Here, the jury was instructed that Marlite was entitled to recover all damages causally related to Eckenrod's breach "as long as there is some reasonable basis for estimating or approximating the amount of the loss or harm even though the exact amount of that loss or harm cannot be determined." [D.E. 197 at 22]. The jury was also advised that damages could not be based on speculation or guesswork.

We find sufficient evidence in this record to support the jury's award of $43,392.50 to Marlite on this claim. The jury heard from Marlite's Chief Financial Officer ("CFO") Kimberly McBride ("McBride") and Plaintiff's damages expert Sergio Negreira ("Negreira"). Both testified about the financial condition of Marlite's Miami facility before and after Canas began working for Modular and soliciting Marlite's customers on Modular's behalf.

McBride provided a detailed factual assessment of the financial impact that Marlite experienced as a result of Canas' employment with Modular. For instance, for each of the 39 Marlite customers that Canas admitted contacting, McBride examined the item numbers, descriptions, quantity, and gross sales amount of the products sold to that customer during the period of time before Canas made contact on behalf of

Modular (in mid-May 2009), and in the five-month period following that date.  Based on this data, McBride observed for most of the 39 customers a price reduction in the period after Canas contacted those customers.  She testified that  Marlite experienced a total of $86,785 in lost profits during this period as a result of reduced pricing that was directly attributable to Canas' employment at Modular.  McBride's findings were discussed at trial and summarized in Plaintiff's Exhibit 109, which was admitted at trial.  Although McBride was not qualified as an expert and therefore could not offer an expert opinion on damage, as Marlite's CFO she certainly was competent to testify about the concrete effects that Marlite experienced as a result of the Defendants' conduct.

Negreira analyzed the effects on Marlite of Modular's hiring of Canas and her subsequent solicitation beginning in May 2009 of 39 of Marlite's customers.  He referred at trial to that conduct as Modular's "unfair competition."  [D.E. 244 at 186]. Negreira calculated "price erosion" damages based on the prices Marlite actually received for products it sold that were competing with the same products sold by Modular, and the prices that Marlite would have gotten "but for" Modular's unfair competition that required Marlite to reduce its prices after May 2009 in order to compete with Modular.  He opined that Marlite suffered more than $1.6 million in past and future damages directly attributable to Canas' solicitation of the 39 Marlite customers.  These and other findings were explored at length at trial and summarized in Plaintiff's Exhibit 159 which was admitted at trial.

Eckenrod raises various issues regarding Negreira's testimony, none of which are sufficient to overturn the jury's verdict or merit much discussion.  Eckenrod violated his Non-Compete Agreement when he hired Canas to work for Modular and solicit Marlite's customers, causing her to violate her non-compete agreement with Marlite.  There was ample evidence to support a jury finding that Canas and the Defendants utilized Canas' unique insight into Marlite's customer and pricing information to undercut Marlite's prices on slatwall in Florida.  It is clear that Negreira's damages analysis of Modular's "unfair competition" necessarily included an assessment of the effects of Eckenrod's conduct – not only Modular's actions, as Modular insists – on Marlite.

Eckenrod argues that Marlite failed to prove it would have earned any profits but for the breach, because the Miami facility had not been profitable since it opened in 2006.  The jury was instructed that to award lost profits, it had to find "to a reasonable certainty that Marlite would in fact have earned profits (of some amount) from the sale of its products but for the breach."  [D.E. 197 at 23].

Marlite may not have proven it generated profits s a whole during the relevant time period, but under these specific circumstances overall that fact alone will not defeat Marlite's damage claim here.  This is not a situation where a losing business claims entitlement to profits that it would never have earned in the first place.  *See, e.g., Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1344-45 (S. D. Fla. 2006) (pharmaceutical company was unsuccessful in linking its failure to generate profits to the defendant's conduct where its financial difficulties actually

preceded the defendant's interference by several months). Instead, Marlite purchased Precision in 2006 with the expectation that it would not be competing with Modular in the slatwall business in Florida for some period of years. Marlite expected to have no competitors beginning in 2006, but it did. The evidence adduced at trial established that Modular was selling slatwall in Florida during this time period, and it affected Marlite's bottom line. The jury's damage award, however, was more focused. The damages awarded were primarily price erosion damages for the difference in value that Marlite's sales suffered due to the improper competition and breach of contract for the time period in 2009 that America Canas worked at Modular. Eckenrod's argument would have far more weight had the jury awarded the extensive lost profit damages that Marlite's expert proposed. The jury rejected that in favor of a modest award that was based largely on specific sales for specific customers over a very finite period of time. The jury's award in this respect is amply supported by the evidence and not undermined by the overall profitability (or lack thereof) of Marlite's Florida operations.[4]

Now we turn to the evidence that supports the jury's damages figures. It seems reasonably clear, based on our review of the record, that the jury used McBride's and Negreira's price erosion analysis to determine damages. More specifically, it appears that the jury accepted his calculations of the present value of Marlite's lost profits for

---

[4]   Eckenrod's profitability argument will also be far more relevant in the second action between Marlite and Modular over the damages allegedly caused by Modular breaching the parties' agreements prior to 2009, which damages were not at issue in this case.

the years 2009 and 2010 as the appropriate measure of damages.[5]  The lost profits for

2009 and 2010 were $162,120 and $236,857, respectively.  The total of these two sums

is **$398,977**, which is the total amount the jury awarded to Marlite, broken down like

this:

> $  43,392.50 (Eckenrod's breach of contract)
> $  43,392.50 (Modular's tortious interference with contract)
> <u>$312,192.00</u> (Modular's misappropriation of trade secrets)
>
> **$398,977.00** (total awarded to Marlite)

As can be seen from this table, the jury was not awarding the same sum twice

when it found Marlite suffered $43,392.50 in damages as a result of Eckenrod's breach

of contract and $43,392.50 based on Modular's tortious interference.  As Plaintiff notes,

$43,392.50 times two is $86,785, which is the total amount of lost profits damages

McBride observed from May through October 2009.[6]

---

[5]    These figures were contained in Plaintiff's Exhibit 160 which was discussed by Negreira and admitted at trial.  [D.E. 225 at 78-80].

[6]    We must address the Final Judgment we entered after trial.  [D.E. 201]. We awarded Marlite a total of $355,584.50 from Modular ($312,192 for the misappropriation claim and $43,392.50 for the tortious interference claim).  [*Id.* at 2 ¶ 1].  We also awarded $43,392.50 from Eckenrod.  We then added that the award against Eckenrod "shall be joint and several with the same damages award included in the judgment entered against Modular."  [*Id.* at 2 ¶ 2].  In ordering that the award against Eckenrod be joint and several with the award against Modular, we improperly limited the amount of damages in contravention of the jury's pronouncement.  That is now clear to us now that we have analyzed the jury's verdict and the supporting record with greater deliberation in response  to the Defendants' post-trial motions.  That review shows that there was in fact no basis for the Court to limit the jury's damage awards in this manner.  Accordingly, we will enter an Amended Final Judgment that corrects this error.

There was a reasonable basis in the evidence for the jury to reach these damages awards.  We find legally sufficient evidence in the record supports the award against Eckenrod, and thus there is no basis to set it aside.

### (b)    *Damages Against Modular and Eckenrod*

Modular also similarly argues that the awards against it for misappropriation of trade secrets ($312,192.00) and tortious interference with contract ($43,392.50) are unsupported by the evidence.  For instance, Modular claims that Negreira's analysis of Marlite's lost volume sales lacked any factual basis because he assumed, incorrectly, that Modular was prohibited from selling slatwall during the relevant time period.  Modular further asserts that Negreira's methodology was flawed because he failed to link Marlite's price decline with Canas' conduct in contacting Marlite's customers or with any of the actions of the Defendants.  Modular concludes that, given the alleged insufficiency of the evidence, the jury's damages awards were speculative and should be set aside.

We disagree.  On this particular issue, it is irrelevant whether Modular was barred from selling slatwall in Florida in 2009; as we now know, it was and had been doing so for several years.  But as Negreira explained, the critical issue is what happened before and after Canas began working for Modular in May of 2009.  The evidence adduced at trial established that as soon as Canas began contacting Marlite's customers on Modular's behalf, Marlite began receiving calls from customers asking for lower prices.  It saw a drop in the volume of slatwall sold.  Marlite faced immediate

pressure to drop its prices in order to retain its customers.  There was no evidence that Marlite faced real competition from any other source.

Negreira calculated the difference between the price Marlite actually received for slatwall products, and the price it would have received "but for" Canas' involvement.  Thus, he did link Marlite's financial situation with Canas' and Defendants' actions.  His opinions and methodology were reliable and sound, and provided a basis for the jury to reach a supportable damages award, as we have outlined above.

Although Defendants offered conflicting testimony, we find there was a legally sufficient evidentiary basis in the record to sustain each of the jury's verdicts in Marlite's favor.  This precludes the entry of judgment as a matter of law, regardless of whether the evidence could have supported a contrary result.  *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264-65 (11th Cir. 2008).  Modular's Rule 50(b) motion is denied.

## B.   *Rule 59 and Remittitur*

### 1.   *Liability*

Defendants move for a new trial on the same grounds previously articulated in their Rule 50(b) motion, i.e., the clear weight of the evidence demonstrates that Marlite was not entitled to a finding of liability on either the misappropriation of trade secrets or tortious interference with contract claim.  Defendants further posit that additional evidence demonstrates why the jury verdict on these two claims was against the great weight of the evidence.

With regard to the misappropriation claim, Defendants claim that Modular could not have misappropriated Marlite's customer information because there was testimony that: Modular's employee gave the customer list to Canas (rather than her generating the list herself); Modular had already made contact with some of the 39 customers that Canas contacted before Canas was hired; Eckenrod knew of and had prior relationships with many of the customers that Canas contacted (showing that Modular did not obtain any Marlite information from Canas); and it was easy to locate slatwall customers on the internet (showing that customer information was readily ascertainable by anyone). Defendants also contend the evidence shows that Canas did not give Marlite's customer or pricing information to anyone at Modular; Marlite's pricing information was irrelevant to Modular because of the difference in manufacturing capabilities of the two companies; and Canas had nothing to do with setting prices at Modular.

As for the tortious interference claim, Modular claims the evidence supports a finding that Eckenrod never had the intention to injure Marlite when he hired Canas and entered the slatwall business in Florida after January 2009.

Defendants have failed to demonstrate that the jury verdict on either claim is against the great weight of the evidence. The jury heard the evidence now cited by Modular; it weighed conflicting testimony and assessed credibility, and we will not disturb the jury's verdict if there is some basis to support it, which there is.

2.    *Prejudicial References*

Defendants also claim they are entitled to a new trial because their substantial rights were affected when Marlite's counsel made prejudicial references during trial that had been barred by motions *in limine*, other court orders, or were erroneous. Defendants cite three categories of inadmissible evidence:  1) references to the fact that defense counsel initially represented Canas but withdrew after the permanent injunction was entered against her in the district court in Ohio; 2) references to matters that were not in evidence or were incorrect; and 3) references to the substance of the Ohio preliminary injunction order.

When a party seeks a new trial on the grounds that the jury was influenced by inadmissible evidence, the trial court must grant a new trial unless the error did not affect any substantial rights.  *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994) ("[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." (citations and internal quotations omitted).

We have reviewed the allegedly prejudicial comments and find they did not run afoul of our rulings; were not objected to and thus any objection thereto was waived; or, when objections were made, the objections were sustained.  The few comments were sprinkled throughout a seven-day trial.  The jury was instructed that anything the lawyers said was not evidence in the case.  We conclude that Defendants' substantial rights were not affected by the exposure to the complained-of comments.  The fact that

the jury rejected Marlite's breach of contract claim against Modular, awarded only a fraction of the total amount of damages sought by Marlite, and refused to award punitive damages on any claim, confirms that the jury was *not* substantially swayed by the improper comments.  To the extent there was error, Defendants have not shown that the error resulted in substantial prejudice or substantial injustice.  Thus, we find no legitimate basis for awarding a new trial on this ground.

### 3. *Damages*

Defendants also seek a new trial on damages.  First, they make the same arguments about Negreira's assumptions, analysis, and expert opinions that they made in support of their Rule 50(b) motion.  These inadequacies, Defendants say, support exclusion of Negreira's testimony at trial.[7]  In addition, Modular complains that Marlite failed to present any evidence of damages that were attributable to Defendants' actions, making the jury's award speculative and against the clear weight of the evidence.  As before, we find that Negreira's analysis and corresponding testimony were sufficiently reliable to support the damages verdict.

Next, Defendants claim that the jury duplicated damages when it awarded the same amount of money for two different claims:  $43,392.50 for Modular's tortious interference with contract and $43,392.50 for Eckenrod's breach of contract.  Defendants recite the general principle that a party seeking recovery for the same injury under different legal theories may recover only once.  *See, e.g., St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1203 (11th Cir. 2009).  To

---

[7]     Defendants moved pre-trial and during trial to exclude Negreira's testimony.

avoid a double recovery by Marlite for the same injury, Defendants request a remittitur on one of the claims to zero or a new trial.

For the reasons discussed in Section III.A.3(a) *infra,* the record fully supports our conclusion that the jury did not make a duplicative award.  We are confident that the jury intended to award $43,392.50 for Eckenrod's conduct *in addition to* the $43,392.50 on the tortious interference claim against Modular.

Finally, Defendants request that we remit damages to zero if a new trial is not granted.  They claim that the jury's award exceeds the amount established by the evidence because Marlite failed to present evidence that Marlite's damages were connected to allegedly improper acts of Defendants and that, but for Defendants' conduct, Marlite would have earned any profit in 2009.

We find remittitur inappropriate in this case.  The jury's total damages award of $398,977 does not exceed the amount established by the evidence.  Negreira opined that Marlite suffered close to $3 million dollars in price erosion and lost volume damages between 2009 and 2016 as a result of Defendants' conduct.  He was subject to extensive cross-examination on the issue.  McBride, too, was examined extensively about her calculation of $86,785 in lost profits over a five-month period of time that she found attributable to Defendants' actions.

The jury was instructed, without objection, as to Marlite's burden on proving lost profits and the manner in which lost profits are calculated under the law.  The jury was not obligated to award the full measure of damages proffered by Marlite.

Obviously we cannot say with certainty which numbers the jury did accept,[8] but it is clear it did not blindly accept the evidence presented.  Rather, the jury carefully weighed the evidence and reached its own independent conclusion as to damages. Based on the record, and absent evidence to the contrary, we presume the jury followed the Court's instructions.  *See, e.g., McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 569 (7th Cir. 2003).  The Court finds the weight of the evidence supports the jury's compensatory damages awards.  There is no basis here on which to grant Defendants' request for a new trial or a remittitur.

## IV.   CONCLUSION

It is hereby **ORDERED AND ADJUDGED** that

1.    Defendants Alvin Eckenrod and Modular Wood Systems, Inc.'s Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b) [D.E. 203] is **DENIED**; and

2.    Defendants' Motion for New Trial Pursuant to Rule 59, Or Alternatively, Motion for Remittitur [D.E. 204] is **DENIED**.

---

[8]    We could speculate that the jury decided to compensate Marlite for a limited number of years, with deductions for items it found were not supported by the evidence.  So, for instance, the jury may have decided that Negreira's calculations for the present value of Marlite's lost profits for the years 2009 and 2010 were the appropriate measure of damages:  the lost profits for these two years are $162,120 and $236,857, respectively, which equals $398,977, the total amount the jury awarded to Marlite.  These specific figures are contained in Plaintiff's Exhibit 160 which was discussed by Negreira and admitted at trial.  [D.E. 225 at 78-80].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of January, 2011.

                                    /s/  *Edwin G. Torres*
                                    EDWIN G. TORRES
                                    United States Magistrate Judge